# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

LIND BROTHERS CONSTRUCTION, )
LLC, a Washington limited liability )
company, )
                                   )
            Respondent, )
                                   )
        v. )
                                     )
CITY OF BELLINGHAM, a Washington )
municipal corporation, )
                                   )
            Appellant, )
                                   )
           and )
                                   )
RESPONSIBLE DEVELOPMENT, a )
Washington nonprofit corporation, )
                                   )
           Intervenor, )
                                   )
and MARK QUENNEVILLE, an )
individual, )
                                   )
                        Appellant. )

No. 67878-7-I
(consolidated with No. 67974-1-I)

ORDER GRANTING MOTION
FOR RECONSIDERATION AND
AMENDING OPINION

2013 MAY 20 AM 8: 40
COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED

The respondent, Lind Brothers Construction, LLC, has filed a motion for reconsideration, clarification, and/or amendment of the court's opinion filed April 8, 2013. The court has taken the matter under consideration and has determined that the motion for should be granted, and that the opinion of the court should be amended.

Now, therefore, it is hereby

ORDERED that the motion for reconsideration is granted; and, it is further

ORDERED that the opinion of the court in the above-entitled cause filed April 8, 2013, be amended to read as follows:

DELETE the following sentence on page 6, under the analysis heading, first section Vesting, which reads:

Mark Quenneville joins the City's appeal of the trial court's decision and contends that the Hearing Examiner erroneously ruled that Lind's application did not vest under the Wetland Stream Ordinance and instead the new Critical Areas Ordinance applied.

REPLACE with the following sentence:

Mark Quenneville joins the City's appeal of the trial court's decision and contends that the Hearing Examiner erroneously ruled that Lind's application vested under the Wetland Stream Ordinance and instead the new Critical Areas Ordinance applied.

Done this 20th day of May, 2013.

FOR THE COURT:

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

LIND BROTHERS CONSTRUCTION, LLC, a Washington limited liability company,

    Respondent,

v.

CITY OF BELLINGHAM, a Washington municipal corporation,

    Appellant,

and

RESPONSIBLE DEVELOPMENT, a Washington nonprofit corporation,

    Intervenor,

and MARK QUENNEVILLE, an individual,

    Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 67878-7-I
(consolidated with No. 67974-1-I)

DIVISION ONE

UNPUBLISHED OPINION

FILED: April 8, 2013

GROSSE, J. — The Bellingham Municipal Code (BMC) authorizes the city of Bellingham (City) to determine what information is necessary to approve a wetland/stream permit and to request that information from the applicant before approving that permit. Thus, the Hearing Examiner correctly concluded that the City's Director of Planning had authority to request from a builder applying for a wetland/stream permit information about the category of a wetland on the property at issue before issuing a decision on the permit. The trial court therefore erred by reversing the Hearing Examiner's ruling. Accordingly, we reverse.

## FACTS

Lind Brothers Construction, LLC (Lind) sought to build three single family homes on three lots located on Wilken Street in Bellingham. The dimension of each lot is 40 feet by 100 feet. Because the property is in an area designated as single family residential with a 20,000 square feet minimum lot, Lind submitted applications to the City for a lot line adjustment permit. The lot line adjustment proposed to revise the lot lines within the property to a layout that allows each of the lots to have at least 60 feet frontage on Wilken Street and sufficient area in the front portion of the lot to site a house. Because the rear portion of each proposed lot contains regulated wetlands, Lind also applied for a wetland/stream permit to develop the proposed lots with residences, including on-site septic systems, an access road, and utilities.

Lind submitted the permit applications on December 5, 2005, the day before the City's new Critical Areas Ordinances, chapter 16.55 BMC, became effective and replaced the Wetland Stream Ordinance, former chapter 16.50 BMC. The applications included the forms and materials relating to the lot line adjustment and wetland/stream permits, a partially completed and unsigned State Environmental Policy Act (SEPA) checklist, and fees for both permits. SEPA fees were not paid until May 8, 2009. Lind also submitted, along with the applications, a November 2005 wetland delineation report prepared by Northwest Ecological Services, LLC (NES). This report identified the site as a Category II wetland under the Wetland Stream Ordinance, which required a minimum of 50-foot buffers. The City processed the wetland/stream application as vested under the Wetland Stream Ordinance and did not notify Lind that the applications were incomplete.

On June 21, 2006, the City requested additional information from Lind that would show 100-foot buffers on wetlands, the locations of sewer/septic systems and other utilities, access road dimensions and design, location and design of stormwater facilities, site plans with setbacks, wetland and stream impacts from on and off site development, and a completed SEPA checklist. The City also indicated that an increase in the required buffer to at least 100 feet was necessary because the wetlands performed at a high level, with one of them scoring 30 points for habitat function, which is particularly sensitive to disturbance.

On August 10, 2006, the City sent a letter to Lind documenting an August 7, 2006 meeting between Lind's representative, Bruce Ayers, and City Planner Kim Weil during which Ayers presented a site plan with 100-foot buffers that appeared to encompass the entire site and did not locate septic systems. Weil suggested Lind work with a wetland biologist to explore buffer averaging and noted that onsite septic systems were not permitted within the buffer. Weil further noted seeking a variance was an option.

On December 5, 2008, Lind submitted additional information to the City, including a revised site plan and proposed street and utility construction. Lind also provided a completed SEPA checklist, a plat certificate, and a Wetland Delineation and Mitigation Plan prepared in November 2008 by NWC, LLC.

On February 27, 2009, the City requested from Lind a mailing for Notice of Application and the SEPA fee. On May 8, 2009, Lind responded to this request. On May 22, 2009, the City issued a Notice of Application for the proposal. The City received comments from the public during and after the designated public comment

period.

On June 27, 2009, the City issued a Mitigated Determination of Non-Significance (MDNS) for the proposal, which contained several conditions. Lind filed an appeal of the MDNS on July 8, 2009.

On August 7, 2009, Weil informed Lind that the City had received public comments asserting that the wetlands on the site actually met the criteria for a Category I "mature forested wetland," and that she had been contacted by Susan Meyer of the Department of Ecology, who had also raised this issue. Weil indicated that the City had determined that a study of the trees within the wetlands was warranted and provided alternatives for Lind to consider, including conducting a field analysis or adding a condition to the MDNS requiring the tree assessment. Lind did not respond.

On August 28, 2009, the City issued a revised MDNS, adding a condition requiring a tree assessment before submitting a building permit application. On September 11, 2009, Lind filed an appeal of the revised MDNS. On January 21, 2010, the City issued a second revised MDNS, which reduced the required buffer from 100 feet to 50 feet and required Lind to demonstrate that the wetland was not a mature forested wetland before applying for any development permit or disturbing the site.

On January 22, 2010, the City approved the lot line adjustment permit, subject to conditions including compliance with the wetland/stream permit conditions and providing a minimum 60 feet of lot width abutting Wilken Street for each lot. On that same day, the City also approved the wetland/stream permit, subject to conditions specified in the approval.

On February 4, 2010, Lind appealed the conditions of the wetland/stream permit

and the second revised MDNS. Mark Quenneville, a neighboring property owner, filed an appeal of the permit approvals, contending that they were not complete and therefore not vested under the Wetland Stream Ordinance, that Lind's proposal did not meet procedural and substantive SEPA requirements, and that the proposal was not consistent with the requirements of the Wetland Stream Ordinance in any event.

The Hearing Examiner concluded that the permit application vested under the Wetland Stream Ordinance and was not subject to the new ordinance. But the Hearing Examiner concluded that the Director erred by issuing the permits before determining the proper category of the wetlands at issue, recognizing that the Director did not have the information he deemed necessary before issuing the permit. Accordingly, the Hearing Examiner ordered the wetland/stream permit be remanded to the Director to determine the category of wetland involved.

The Hearing Examiner further concluded that the wetland/stream permit conditions were proper[1] and that the Director did not err by making the lot line adjustment conditional on compliance with the wetland/stream permit. The Hearing Examiner also rejected Lind's argument that the SEPA conditions of the MDNS were unauthorized, concluding that the MDNS requirements did not attempt to impose additional mitigation under SEPA, but simply repeated the requirements of applicable development regulations.

Lind appealed the Hearing Examiner's decision to the Whatcom County Superior Court under the Land Use Protection Act (LUPA). The trial court reversed the Hearing

---

[1] The Hearing Examiner did find that two conditions of the MDNS needed clarification. These conditions related compliance with street standards and water and sewer services.

5

Examiner's decision as follows:

> ORDERED that Petitioner Lind Brothers appeal is GRANTED in its entirety and the decision issued by the City of Bellingham Hearing Examiner below is hereby REVERSED to the extent that Petitioner has Appealed that ruling, including, but not limited to the following orders:
>
> It is ORDERED that
>
> 1)  The Lot Line Adjustment Permit is AFFIRMED, with all conditions challenged by Lind being STRICKEN.
> 2)  The Wetland Stream Permit is AFFIRMED, with all conditions challenged by Lind being STRICKEN.
> 3)  The City shall condition the permits on Lind's compliance with the 2008 mitigation plan by NWC.
> 4)  Any variances required for Lind to construct three homes on the subject property are hereby granted.
> 5)  This Court retains jurisdiction to ensure the City of Bellingham complies with this order and processes the permits for the project in a timely manner.

The City and Quenneville appeal.

## ANALYSIS

### 1. Vesting

Mark Quenneville joins the City's appeal of the trial court's decision and contends that the Hearing Examiner erroneously ruled that Lind's application did not vest under the Wetland Stream Ordinance and instead the new Critical Areas Ordinance applied. This ruling was not appealed to the trial court by any of the parties. Lind contends that as a result, Quenneville is barred from raising it now because he failed to preserve it for review.

LUPA is the exclusive means of appealing a land use decision.[2] A timely LUPA petition must be filed and served within 21 days of the issuance of the land use

---

[2] RCW 36.70C.030; Holder v. City of Vancouver, 136 Wn. App. 104, 107-08, 147 P.3d 641 (2006).

decision.[3] A land use petition is barred, and the court may not grant review, unless the petition is timely filed and served.[4] Because Quenneville did not file a LUPA petition challenging the Hearing Examiner's ruling on the vesting issue, his claim appears to be barred on review.

Nonetheless, the claim lacks merit. Under the vesting provisions of the BMC, "an application for a land use permit or other project permit shall be considered under the development regulations in effect on the date of filing that complete application as defined in BMC 21.10.120(A)."[5] BMC 21.10.120(C) addresses the procedures to determine whether an application is complete:

> Within 28 days after receiving a permit application, the City shall mail, fax or otherwise provide to the applicant or his authorized representative a written determination which states either that the application is complete or that the application is incomplete and what is necessary to make the application complete. If the Director does not provide a written determination with the 28 days, the application shall be deemed complete as of the end of the 28th day.

Quenneville argues that because the City did not provide a determination of completeness the application was not deemed complete until 28 days after it was filed and when the new ordinance was in effect. But as Lind contends, these provisions do not state that the application can only be deemed complete on the 28th day when the City does not notify the applicant that the application was incomplete. Rather, this addresses the situation where completeness becomes an issue after filing. Here, there is nothing in the record to suggest that the application was incomplete at the time of filing. Thus, absent evidence that it was incomplete at the time of filing, the controlling

---

[3] RCW 36.70C.040(3)
[4] RCW 36.70C.040(2).
[5] BMC 21.10.260.

7

date for purposes of vesting is the date it was filed, which was before the new ordinance went into effect. Otherwise, the interpretation advanced by Quenneville would lead to the absurd result that the City could "unvest" an application simply by failing to make a completeness determination within the vesting period.

## 2. Director's Request for Information about Wetland Category

The City contends that the trial court erred by reversing the Hearing Examiner's ruling that the permit be remanded to the Director to determine whether the wetland was a Category I wetland before issuing the permit. The City argues that the Hearing Examiner properly remanded for the Director to gather more information because the Wetland Stream Ordinance authorized the Director to request information about the category of wetland involved before issuing the permit. We agree.

Former BMC 16.50.060 provides:

Collection of information necessary for the determination of wetland boundaries (delineation) and category will ultimately be the responsibility of the property owner. Normally this will be done via a field survey by a wetland specialist applying the wetland delineation method and category types. The City-wide wetland inventory maps and data sheets will assist in this process. When, in the opinion of the Director, sufficient information exists in the City's wetland inventory, the requirement for a full or partial delineation and category determination may be waived.

The Director shall determine when a permit application is required and what additional information may be necessary. . . .

Former BMC 16.50.080(B) imposes buffer requirements determined by the category of wetland at issue. Thus, the Director was required to first determine which category was involved in order to adequately protect the wetland in accordance with former BMC 16.50.030(A)(3). Here, the Director determined that additional information was necessary to properly categorize the wetland based on public comments suggesting

8

that the wetland met the criteria for Category I wetlands requiring a larger buffer. This was contrary to the categorization of the wetland in the 2005 NES report submitted by Lind.

Lind contends that the City should have conducted an investigation itself into the credibility of the public comments before requesting Lind to provide a mature tree study. But as the City correctly notes, former BMC 16.50.060 places the responsibility to collect such information on the applicant. Lind further argues that the City was required to engage in the process under former BMC 16.50.060 to challenge a wetland delineation from the NES report. But as the City points out, that provision addresses wetland boundary determinations, not wetland category determinations, stating:

> A determination of the wetland boundary provided by the applicant shall be subject to the approval of the Director who may require adjustments to the boundary delineation. In the event the adjusted boundary delineation is contested by the applicant, the Director and the applicant shall jointly select a wetland specialist who will delineate the disputed boundary as the final determination at the property owner's expense.[6]

Thus, Lind fails to show that the Hearing Examiner erred by concluding that the Director was authorized to request additional information he deemed necessary to determine the category of wetland before issuing the permit. Accordingly, we hold that the trial court erred by reversing this ruling.

3. MDNS Conditions

The City contends that the conditions of the MDNS were all based on provisions of the BMC and did not attempt to impose additional SEPA mitigation as Lind asserts. We agree.

---

[6] Former BMC 16.50.060.

The second revised MDNS imposed the following conditions:

1) **Revised Condition:** The buffer for the main wetland onsite, Wetland A (Wetland B is part of Wetland A) shall have a minimum 50-foot buffer which may be averaged. Averaging shall be calculated in accordance with BMC 16.50.040.

2) No portion of the development is allowed in the wetland buffer after averaging occurs, including, but not limited to onsite septic systems, stormwater facilities, buildings, patios or any other development that would alter buffer vegetation and function are not allowed in the wetland buffer. A driveway may be located with the Wilken right-of-way if all environmental impacts are mitigated on site as presented in a mitigation plan approved by the City.

3) Wetland buffer impacts are limited to those that can be mitigated on site as presented in a mitigation plan approved by the City.

4) Wetland buffer mitigation shall be designed, implemented, and maintained in accordance with the most recent Dept. of Ecology (DOE) guidance on wetland mitigation. The wetland buffer mitigation plan shall demonstrate how each of the wetland functions is being protected by the mitigation plan.

5) If work is required to replace or extend the culvert, an HPA from the Washington Dept. of Fish & Wildlife (WDFW) shall be obtained prior to any site work.

6) If any wetland fill occurs, the Army Corps of Engineers shall be notified and written approval shall be obtained from the Army Corps of Engineers and provided to the City prior to any site work.

7) A City Wetland/Stream Permit shall be obtained prior to any site disturbance.

8) Access to the site shall be from a minimum standard improved street within a 60-foot right of way.

9) An 8-inch water and 8-inch sewer public mains shall be extended across the full frontage of the site in compliance with BMC 15.08.080 and 15.12.070, respectively.

10) **New Condition:** Prior to any development permit application or site disturbance, demonstrate that Wetland A (Wetland B is part of Wetland A) is not a mature forested wetland as defined by the Dept. of Ecology's Wetland Rating System for Western Washington (DOE 2004) in accordance with protocol approved by the Dept. of Ecology.

For the City, Kim Weil testified that the basis of each condition imposed in the MDNS was found in the BMC as follows: Condition 1 was based on former BMC 16.50.080(B), which sets buffer standards; Condition 2 was based on former BMC 16.50.080(D), which specifies and limits permitted uses within the buffer; Condition 3

10

was based on former BMC 16.50.030(A)(2), which states the purpose of former chapter 16.50 BMC as adhering to a policy of "no net loss of regulated wetland and stream functions;" and Condition 4 was based on former BMC 16.50.080(A), which specifies buffer criteria "to provide the most effective protection of the wetland/stream system based on actual site circumstances."

Weil further testified that Conditions 5 and 6 addressed federal and state wetland regulations under the Clean Water Act, which gives authority to the Army Corps of Engineers and DOE to regulate wetlands. She also testified that both conditions were based on former BMC 16.50.100, which provides, "Whenever a project may involve work in a wetland or stream, proponents should consult with the U.S. Army Corps of Engineers, State Department of Ecology, Department of Fisheries or Wildlife, Department of Natural Resources or other appropriate agencies regarding their permit requirements."[7] Weil also testified that Condition 7 was based on former BMC 16.50.090(A), which requires a permit for regulated activity within a regulated wetland, stream, or buffer area. She further noted that BMC 16.20.200 of the City SEPA code allows conditions that are based on the BMC.

As to Conditions 8 and 9, Weil testified that they are also based on the authority granted by the City SEPA code. She testified that Condition 8 was based on BMC 13.04.070(B), which specifies minimum standards for residential access streets and right-of-way. She also testified that Condition 9 was based on BMC 15.08.080 and BMC 15.12.070, which specify when a water and sewer main extension is required. Finally, she testified that Condition 10 was based on former BMC 16.50.050(A)(2) and

---

[7] Former BMC 16.50.100(H).

11

16.50.080(B), which regulate mature forested wetlands and require a 100-foot minimum buffer. Thus, Lind fails to show that the Hearing Examiner erred by concluding that the conditions did not impose additional mitigation under SEPA. Accordingly, we hold that the trial court erred by reversing the Hearing Examiner's ruling and striking the conditions.

## 4. Effect of Lot Line Adjustment Permit

The City further contends that the Director properly conditioned issuance of the lot line adjustment on issuance of the wetland/stream permit because approval of the wetland/stream permit related to one of the criteria for approval of the lot line adjustment. Lot line adjustment applications must follow the procedures in chapter 21.10 BMC, which establishes the standard procedures for land use and development permit decisions made by the City.[8] BMC 21.10.100(D) permits the Director to approve an application, approve an application with conditions, or deny an application. Four criteria specified in BMC 18.10.020(B) must be met in order for the City to approve a lot line adjustment: (1) no new lots are created; (2) each proposed lot meet minimum lot standards or if the existing lot is already less than the required minimum is not further reduced by the proposed adjustment; (3) the proposed adjustment does not further infringe on the City Land Use Development Ordinance; and (4) the proposed adjustment improves the overall function and utility of the existing lots.

Here, compliance with the conditions in the wetland/stream permit would result in creating three building developments in the adjusted lots that would not be located in a regulated wetland or buffer. Thus, compliance with the wetland/stream permit

---

[8] BMC 18.10.020(A).

12

conditions would improve the overall function and utility of the lots, satisfying one of the criteria for lot line adjustment approval. The Director's decision to condition issuance of the lot line adjustment on approval of the wetland/stream permit was therefore permissible under the code and consistent with the procedure for approving lot line adjustments; issuance of the wetland/stream permit here simply established one of the criteria required for approval of the lot line adjustment.

5. Evidence in Support of Hearing Examiner's Decision

The City contends that the Hearings Examiner's ruling was supported by substantial evidence despite Lind's contentions to the contrary. Specifically, Lind challenged Findings of Fact 43, 63, 64, 65, 66, and 68.

The record supports Finding of Fact 43: "Neither of the wetland delineation and mitigation studies engaged in the field investigation necessary to determine the potential existence of a mature forested wetland on the subject site and adjoining wetland areas." The evidence in the record was Vikki Jackson's report, which did not state that she performed the field analysis required to determine whether the wetlands met the criteria for mature forested wetlands nor did it identify the wetland type on the wetland rating field data form in the report. While Lind argues that Jackson's report was evidence that the wetland did not meet the criteria of a mature forested wetland, the Hearing Examiner resolved this factual dispute in the City's favor and this determination was supported by the record. Accordingly, the challenge to this finding fails.

Lind also challenges Finding of Fact 68 that Kim Weil testified that the wetland classification for a nearby property in Fairhaven Highlands was changed to Category I because of the presence of a "mature forested wetland." Lind contends that this was

not within the scope of the Hearing Examiner's review because it involves a different project. But as the City notes, this fact was relevant because of the connectivity between the wetlands on Lind's property and the Fairhaven Highlands property and Vikki Jackson conducted field analysis on both properties. In any event, Lind does not contend that this finding was not supported by the record. Lind's challenge to it therefore fails.

The record also supports Finding of Fact 63 that Quenneville "conducted an informal survey of trees on or near the subject property and counted [and] measured about 18 trees that were at least 21-inches in diameter at breast height." Lind challenged this finding contending that Quenneville's observations were contradicted by the 2005 NES report and Jackson's testimony. But the existence of contradictory evidence is not a basis for challenging a finding so long as it is supported by the record; factual disputes are resolved by the fact finder and may not be reviewed on appeal. Here, the record contains Quenneville's testimony about his observations, which the Hearing Examiner found credible. Lind's challenge to this finding therefore fails.

Lind's remaining challenges to the findings of fact suffer from this same flaw as he simply points out contradictory evidence or contests the truth of the witnesses' observations.[9] Again, the Hearing Examiner resolves those issues of fact and those factual determinations cannot be challenged on appeal if supported by the record.

---

[9] Finding of Fact 64 states the observations of John McLaughlin a conservation biologist, who observed the site; Finding of Fact 65 states the comments of Nick Sky, an ecologist, who visited the site and testified about the need for additional analysis; Finding of Fact 66 states the comments of Dr. Sarah Cooke who visited the site and concluded that the smaller wetlands are part of the larger connected system, requiring a larger buffer; and Finding of Fact 68 states Kim Weil's conclusions about the necessity for a 100-foot buffer to protect the wetlands.

Here, the record contains the testimony of witnesses about their observations and opinions, which the Hearing Examiner found credible.

## 6. Variances

Finally, the City contends that the trial court had no authority to grant "[a]ny variances required for Lind to construct three homes on the subject property." The City correctly notes that variances were not at issue on the LUPA appeal and therefore not within the scope of the trial court's review. LUPA defines an appealable "[l]and use decision" as the final determination by a local jurisdiction on an application for a project permit.[10] The trial court may affirm or reverse the land use decision under review or remand it for modification or further proceedings.[11] Here, there was no land use decision to affirm, reverse, or remand with respect to any variances; in fact Lind did not apply for variances. Thus, the trial court exceeded its authority in the LUPA appeal by granting Lind "[a]ny variances required" to construct the homes on the subject property.

We reverse.

_Grosse_

WE CONCUR:

_Spearman, A.C.J._

_Dwyer, J._

---

[10] RCW 36.70C.020(2).
[11] RCW 36.70C.140.